

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------------X

LUCIO CELLI,

                              Plaintiff,                 No. 15-cv-3679
                                          **(BMC)**(LB)

                  -against -                   **VERIFIED
                                          AMENDED
                                          COMPLAINT**

NEW YORK CITY DEPARTMENT OF EDUCATION,
ANNE BERNARD (in her Official and Individual Capacity),      *Jury Trial Demanded*
RICHARD COLE (in his Official and Individual Capacity),
COURTENAYE JACKSON-CHASE, ESQ (in her Official
and Individual Capacity), Ms. Susan Mandel, ESQ (in his
Official and Individual Capacity), and GRISMALDY
LABOY-WILSON (in her Official and Individual
Capacity),

                                  Defendants.
-------------------------------------------------------------------------------------X

     Plaintiff, LUCIO CELLI, PRO SE, respectfully alleges, upon knowledge and his own actions, and upon information and belief as to all other matters, as follows:

### NATURE OF THE CASE

1. This is an employment discrimination and civil rights action against Defendants, New York City Department of Education and the above named individual Defendants, Anne Bernard, Grismaldy Laboy-Wilson, Tod d Drantch, Courtenaye Jackson-Chase, and Richard Cole, for:

     a. Disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; the New York Executive Law § 296 (New York

1

State Human Rights Law)("NYSHRL"); the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983; the New York City Human Rights Law ("NYCHRL"), and,

b.  Racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983; 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e) et seq.; Title VII (race, color, religion, national origin and sex), 42 U.S.C. 2000e-3(a); the New York Executive Law § 296 (New York State Human Rights Law)("NYSHRL"); and, the New York City Human Rights Law ("NYCHRL"); and,

c.  Violation of Plaintiff's rights of due process under the Due Process Clause of the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983; and,

d.  This is an action for declaratory relief, injunctive relief, damages and to secure protection of and to redress deprivation of rights secured by Fair Labor Standards Act (FLSA), 29 U.S.C. § 215(a)(3); and,

e.  This is an action for declaratory relief, injunctive relief, damages and to secure protection of and to redress deprivation of rights secured by a breach of contract (collective bargaining agreement) claim under the LMRA (29 U.S.C.A. § 185(a)) for a union member; and,

f.  This is an action for declaratory relief, injunctive relief, damages and to secure protection of and to redress deprivation of rights secured by an invasion of privacy tort; and,

g.  This is an action for declaratory relief; injunctive relief, damages and to secure protection of and to redress deprivation of rights secured by defamation; and,

h.  This is an action for declaratory relief; injunctive relief, damages and to secure protection of and to redress deprivation of rights secured by New York State Fair Employment Act (also known as the Taylor Law); and,

i.  This is an action for declaratory relief; injunctive relief, damages and to secure protection of and to redress deprivation of rights secured by Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-7 et seq,. New York City Department of Education is receiving Federal funds for the under various programs to help students. Title VI requires the recipients of federal funds to waive their Eleventh Amendment sovereign immunity rights; and,

j.  This is an action for declaratory relief; injunctive relief, damages and to secure protection of and to redress deprivation of rights secured by 42 U.S.C § 1981; and,

k.  This is an action for declaratory relief; injunctive relief, damages and to secure protection of and to redress deprivation of rights secured by Free violation of Plaintiff's rights of "Free Speech and Privacy" pursuant to 42 U.S.C. § 1983; and,

l.  This is an action for declaratory; injunctive relief, damages and to secure protection of and to redress deprivation of invasion of privacy, fraud, and emotional stress; and,

m.  This is an action for declaratory relief; injunctive relief, damages and to secure protection of and to redress deprivation of rights secured by the 42 U.S.C § 1981; and

3

n.  This is an action for declaratory relief, injunctive relief, damages and to secure protection of and to redress deprivation of rights secured by the 42 U.S.C § 1983; and,

o.  This is an action for declaratory relief, injunctive relief, damages and to secure protection of and to redress deprivation of rights secured by the 42 U.S.C § 1985 against Jackson-Chase, Drantch, and Blassman; and

p.  This is an action for declaratory relief, injunctive relief, damages and to secure protection of and to redress deprivation of rights secured by 18 U.S. Code § 241. A Civil Conspiracy between Jackson-Chase/Drantch , of New York City Department of Education, with Angela Blassman, of New York State Public Relations Board and Angela Blassman and Morelli/Tand, who were the Plaintiff's former attorneys for the Plaintiff; and,

q.  This is an action for declaratory relief, injunctive relief, damages and to secure protection of and to redress deprivation of rights secured by the Title VII of Civil Rights Act of 1964 (42 U.S.C. § 12203(a); and,

r.  This is an action for declaratory relief, injunctive relief, damages and to secure protection of and to redress deprivation of rights secured by New York State Civil Service Law section 75-b, commonly known as the "whistleblower law" because New York City Department of Education (through their agents) along with United Federal of Teachers (through their agents)  and New York State Public Relations Board (through their agents) committed white collar crimes to deprived Lucio of rights found in Cleveland Board of Education v. Loudermill; and,

4

**s.**  This is an action for declaratory relief, injunctive relief, damages and to readdress a claim for negligent retention of supervisors which arises when an employer places an employee in a position to cause foreseeable harm, harm which the injured party most probably would have been spared had the employer taken reasonable care in supervising or retaining the employee;

**t.**  This is an action for declaratory relief, injunctive relief, damages and to readdress a claim for fraudulent documents emailed or mailed pursuant to 18 U.S.C. § 1341 ("Wire Fraud") and 18 USC 1343 ("Mail Fraud");

**u.**  New York Fraud law is governed not only by the common law causes of action of fraudulent inducement and fraudulent concealment among others, but also by the New York Statute, the 'Deceptive Practices Act' and,

**v.**  This is an action for declaratory relief, injunctive relief, damages and to readdress a claim for the emotional stress caused by the citation of fake legal documents, the submission of fraudulent documents (29 C.F.R. § 1602.14), fake rules and policies of the New York City Department of Education and New York State Public Relations Board, to influence the Plaintiff in believing that lawyers are immune from criminal statues (federal and state) and from decisions rendered by the Supreme Court (like Board of Education vs. Loudermil), and government agencies committing white collar crimes against the Plaintiff, which is pursuant to N.Y. C.P.L.R. § 215(3), 14

5

N.Y.Prac., New York Law of Torts § 1:40 and 75A N.Y. Jur. 2d Limitations and Laches § 215

## PRELIMINARY STATEMENT

2.  Plaintiff Lucio Celli ("Lucio") is a Caucasian man who suffers from a serious, chronic illness of the immune system, the Human Immunodeficiency Virus ("HIV"). HIV is a legally recognized disability within the meaning of the ADA. Lucio, however, is much more than his disability.  Lucio currently works as a certified, tenured, full-time, public high school teacher for the New York City Department of Education ("DOE").  In 2013-2014, he also taught an adult education class "per session" in the evening for the DOE and reasonably expected to teach adult education classes in the summer as well.  Lucio, who has been teaching for 16 years, has been such an exemplary educator that he has also served as a mentor and staff developer for other teachers.

3.  Sadly, beginning in the 2013-2014 school year, Lucio's supervisors in both jobs have subjected him to discrimination, the first supervisor on the basis of disability, both perceived and actual, and his two other supervisors on the basis of race.

4.  First, on March 4, 2014, at his job at High School X519, the Principal improperly questioned Lucio in connection with his need to receive a delivery of his medication for his disability at his home, driving him to tears.  The Principal assumed Lucio was taking medication for anxiety (although the medication was actually for HIV), and thereafter, she repeatedly ridiculed and humiliated him for his purported anxiety and segregated him from his co-workers.  She even ordered Lucio to report for a psychological exam to determine his fitness

6

for teaching, violating the ADA, as she had no objective reason to find his teaching unsuccessful or unsafe for his students. At that point, Lucio, objecting to the psychological exam, and to his distress, felt compelled to disclose to his superiors that he actually had HIV. Until then, he had kept his illness confidential at work and at home. Yet, even *after* his unwilling disclosure, Lucio's superiors *still* ordered him to undergo the psychological exam. When he did so in August 2015, the psychologist informed him she found nothing wrong with him.

5. Second, between 2013 and 2014, Lucio's supervisors for his adult night classes at the Bronx Adult Learning Center ("Center"), subjected him to disparate and discriminatory treatment on the basis of his Caucasian race. His supervisors, who are non-Caucasian, denied Lucio the textbooks he needed, while giving preferential treatment to the three other teachers of adult students at the Center, who are non-Caucasian. Further, one of his supervisors targeted Lucio with unwarranted, poor evaluations and false evaluations, while the other three teachers, who were less qualified than Lucio, all received good evaluations. Because of the negative evaluations, the Principal at the Center denied Lucio a summer teaching position that he was entitled to on the basis of his seniority. She replaced Lucio with one of four non-Caucasian teachers, each with less seniority than Lucio.

6. On June 27, 2014, Lucio received a "U" or Unsatisfactory rating for his per session teaching, which was improperly sent without supporting documents. Nevertheless, Lucio appealed the rating and a DOE appeals hearing was held on May 4, 2015.

7. However, the appeal process was highly procedurally defective. Lucio did not receive, as mandated by the DOE, a complete set of the documents used to evaluate him prior to the

7

hearing. The evidence used against Lucio at the hearing improperly included only partial, unsigned teaching observation reports. The evidence did not include a mandatory, formal observation report by the Principal, as there had been no such observation, which violated DOE evaluation procedures. Further, at the hearing, Lucio was informed he was not allowed to cross examine the Principal. In short, the hearing was rigged against Lucio in violation of his due process rights. The U rating was upheld on appeal, based on defective procedures, false and incomplete evidence, and no cross-examination, resulting in a deprivation of Lucio's property interest in continuing to teach adult classes for the DOE.

8. Due to Defendants' discrimination on the basis of his disability, Lucio has suffered discriminatory harassment and retaliation. Due to Defendants' discrimination on the basis of his race, Lucio has suffered discriminatory disparate treatment. Due to Defendants' violation of his due process rights, Lucio has been deprived of his property interest in a summer teaching position, and, if Defendants are not deterred by this action, he may receive a second unjustified U rating, and may then lose his teaching job altogether.

9. Due to Lucio's filing EEOC charges, the Defendants harassed and retaliated against the Plaintiff at administrative hearings. Defendants' actively and viciously deprived Lucio of his due process rights at administrative hearings. The harassment and retaliation were egregiously done to Lucio and the acts took the form by the Defendants citing fake documents, writing false and/or inaccurate inform on legal documents, the suspension of an internal grievance hearing, and the citation of fake polices. As a result, Lucio has been deprived of his property interest and fears that the Defendants will continue their devious acts

8

if the court does not address their actions. Defendants must be deterred from using illegal documents to harm their employees.

## JURISDICTION AND VENUE

10. This Court has original subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and §§ 1343(a)(3) and (4), as this action seeks redress for the violation of Plaintiff's constitutional and civil rights.

11. Venue is proper in this case pursuant to 28 U.S.C. § 1391(b)(1), because the Eastern District of New York is the judicial district where a substantial part of the events, the appeals hearing at the DOE in Brooklyn, New York, or omissions giving rise to these claims, occurred.

12. All administrative exhaustion requirements have been met or will be met.  Plaintiff Lucio Celli filed a timely Charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), which included a claim for racial discrimination, and received an EEOC Notice of Right to Sue letter on or about March 26, 2015.  Plaintiff filed his lawsuit *pro se* on June 24, 2015, within 90 days of the EEOC right to sue letter.  Plaintiff submitted another related charge under the ADA for more recent disability discrimination and the EEOC issued the Plaintiff a Notice of Right to Sue Letter on July 13, 2016. Plaintiff filed the "right to sue letter" on September 24, 2016 and this date is within 90 days to file with the court. Plaintiff filed Notices of Claim with the NYCDOE and/or the New York City Comptroller's Office on several dates, including most recently on May 5, 2015 and October 22, 2015. **There should have been a compliant filed at New York State Human Rights Division, but the Steven Morelli Firm had to be vindictive towards the Plaintiff because**

**of Administrative Law Judge Angela Blassman of PERB—according to the Human Rights Division, a complaint was never filed on by behalf.**

## PARTIES

13. Plaintiff LUCIO CELLI ("Lucio") is a resident and domiciliary of Bronx County, New York. At all times relevant, LUCIO was an "employee" of Defendant NEW YORK CITY DEPARTMENT OF EDUCATION ("DOE") as that term is defined by Title VII and the ADA.

14. Defendant NEW YORK CITY DEPARTMENT OF EDUCATION ("DOE") is a municipal corporation incorporated under the laws of the State of New York, which is in charge of all public schools in the City of New York. Its headquarters are located at 52 Chambers Street, New York, NY 10007. At all times relevant to this complaint, Defendant DOE was Plaintiff's "employer" as that term is defined by Title VII and the ADA.

15. Defendant NEW YORK STATE PUBLIC RELATIONS BOARD ("PERB"). PERB has authorizes under a governor-appointed State Public Employment Relations Board to resolve contract disputes for public employees while curtailing their right to strike. The **Public Employees Fair Employment Act** (more commonly known as the **Taylor Law**) refers to Article 14 of the New York State Civil Service Law, which defines the rights and limitations of unions for public employees in New York. Its headquarters are located at PO BOX 2074, ALBANY, New York 12220.

16. Defendant ANNE BERNARD ("Bernard") at all times hereinafter mentioned, was the Principal of the Emolier Academy, the location of the Bronx Adult Learning Center, at 1970 West Farms Road, Bronx, New York, 10460. At all times relevant to this complaint, Bernard

was Plaintiff's supervisor, and acted under color of state law and in the scope of her employment with the DOE. Bernard is being sued in her Official and individual capacity under 42 U.S.C. § 1983.

17. Defendant RICHARD COLE ("Cole"), at all times hereinafter mentioned, was an administrator at the Emolier Academy, the location of the Bronx Adult Learning Center, at 1970 West Farms Road, Bronx, New York, 10460. At all times relevant to this complaint, Defendant Cole was Plaintiff's supervisor, and acted under color of state law and in the scope of his employment with the DOE. Cole is being sued in his Official and individual capacity under 42 U.S.C. § 1983.

18. Defendant GRISMALDY LABOY-WILSON ("Wilson"), at all times hereinafter mentioned, was and continues to be is the Principal of DOE school X519 located at 1440 Story Avenue, Bronx, New York 10473. At all times relevant to this complaint, Defendant Wilson was Plaintiff's supervisor, and acted under color of state law and in the scope of her employment with the DOE. Laboy-Wilson is being sued in her Official and individual capacity under 42 U.S.C. § 1983.

19. Defendant COURTENAYE JACKSON-CHASE ("JACKSON-CHASE"), at all times hereinafter mentioned, was the former General Counsel for New York City Department of Education at 52 Chambers Street, New York, New York 10007. At all times relevant to this complaint, Defendant Jackson-Chase was Plaintiff's supervisor (final decision maker for grievances and appeals) , and acted under color of state law and in the scope of her employment with the DOE. Jackson-Chase is being sued in her Official and individual capacity under 42 U.S.C. § 1983.

11

20. Defendant TODD DRANTCH ("Drantch"), at all times hereinafter mentioned, was and continues to be an attorney for New York City Department of Education Office of Legal Services at 100 Gold Street, New York, 10007. At all times relevant to this complaint, Defendant Drantch was Plaintiff's opposing council at PERB, and acted under color of state law and in the scope of his employment with the DOE. Drantch is being sued in his Official and individual capacity under 42 U.S.C. § 1983.

21. Defendant Angela Blassman ("Blassman"), at all times hereinafter mentioned, was and continues to be the Administrative Law Judge for New York State Public Relations Board at 55 Hanson Place, Brooklyn, New York 11217. At all times relevant to this complaint, Defendant Blassman was Plaintiff's Administrative Law Judge for improper practices charges brought before PERB, and acted under color of state law and in the scope of her employment with the DOE. Blassman is being sued in her Official and individual capacity under 42 U.S.C. § 1983.

22. As set forth below, the individually named Defendants endorsed and directly participated in the discriminatory, harassing, and/or retaliatory conduct against Plaintiff. Accordingly, the individually named Defendants aided and abetted the discriminatory, harassing, and/or retaliatory conduct against Plaintiff.

## Factual Background

12

23. Defendants are aware that "Employers are bound by specific laws and court decisions that relate to the procedural and substantive requirements to effect discharge or other disciplinary penalties that are the provisions of sections 75, 75-b, 76 and 77 of New York State Civil Service Law and/or the negotiated agreements between the various bargaining units and each public employer," which they willfully violated against Lucio.

24. Defendants are aware that "New York State Civil Service Law section 75-b, commonly known as the "whistleblower law," prohibits a public employer from taking disciplinary action against a public employee because that employee reveals information to a governmental body regarding a violation of a law, rule or regulation which presents a substantial and specific danger to public health and safety or reveals information which the employer reasonably believes is true and constitutes an improper governmental action," which the Defendants willfully violated against Lucio.

25. Defendants are aware that "The provisions of sections 75, 75-b, 76 and 77 of New York State Civil Service Law requires the procedures followed and steps taken before charges are served lay the foundation for the formal disciplinary proceeding" (which is related to Cleveland Board of Education v. Loudermill), which the Defendants willfully violated against Lucio because Defendants chose to commit a white collar crime and falsify documents.

26. Defendants are aware that "The provisions of sections 75, 75-b, 76 and 77 of New York State Civil Service Law requires places, therefore, that the same principles of due process which govern the formal proceeding be applied also in the preliminary stages, particularly in the conduct of investigations, in conferences with the employee and in preparing the case" which

13

the Defendants willfully violated against Lucio because Defendants chose to commit a white collar crime and falsify documents.  In fact, this language **IS FOUND** in arbitration decisions between the United Federation of Teachers and New York City Department of Education—but Lucio had to be a victim of fraud and, based on the fraud, listen to Bernard say, "we can't speak about now. (sigh)"

27. The Defendants are aware that "The provisions of sections 75, 75-b, 76 and 77 of New York State Civil Service Law requires an employer to avoid trying to mislead an employee or to place her or him at an unfair disadvantage," which the Defendants willfully violated against Lucio because Defendants chose to commit a white collar crime and falsify documents.


28. There are numerous arbitration decisions between the DoE and Untied Federation of Teachers ("UFT") that includes the language of the provisions of sections 75, 75-b, 76 and 77 of New York State Civil Service Law, and of Cleveland Board of Education vs. Loudermill.



*Disability Discrimination*

29. Plaintiff Lucio Celli ("Lucio") suffers from a serious and chronic physical disorder of the immune system, HIV, which is a disability within the meaning of the ADA, the NYSHRL, and the NYCHRL.

30. Lucio is under the care of a physician for HIV and must take the prescription drug ritonavir regularly.

31. Lucio is a certified, tenured, full-time New York City public high school teacher at X519 in Bronx, New York

32. In addition to his job at X519, in the 2013-2014 school year, Lucio taught an evening adult education class "per session" at the Bronx Adult Learning Center, in School District 79, which is located in the Emolier Academy, a public school, in Bronx, New York.

33. Even with his disability, Lucio has performed his duties in both of the above described jobs.

34. Prior to the 2013-2014 school year, Lucio routinely received satisfactory ratings for his teaching.

35. In fact, Lucio has been a mentor and staff developer for other New York City teachers.

36. Grismaldy Laboy-Wilson ("Wilson") is the Principal of X519 and Lucio's supervisor.

37. On or about March 4, 2014, Lucio requested permission from Wilson to take a personal day, for a medical matter, the delivery of a package of his prescription medicine for his immune disorder, HIV, which needed to be refrigerated.

38. Lucio was entitled to take a personal day under his union's contract with the New York City Department of Education.

39. Lucio was fearful to ask Laboy-Wilson for the day off because Laboy-Wilson wrote Lucio up for attendance. Please take notice, Lucio was a victim of a crime and half of the days were to heal from the physical crime Lucio experienced.

40. In response to Lucio's request, Wilson demanded to know the purpose of the requested personal day as well as what the package to be delivered contained, threatening Lucio with the consequence of writing him up, which was disciplinary action, if he did not tell her.

41. Lucio was entitled to privacy for his disabling medical condition, and he was so distressed by Wilson's outrageous and invasive threat and demands that he broke down in tears.

42. Wilson then stated to Lucio, "you are anxious."

43. From Wilson's statement, Lucio inferred that Wilson had incorrectly assumed the package addressed to him contained medication for anxiety and that she regarded him as suffering from anxiety.

44. However, Lucio did not correct Wilson's perception that he suffered from anxiety, as he did not want to disclose his actual medical condition and disability to her.

45. Subsequently, Wilson subjected Lucio to ridicule and humiliation, with comments to Lucio such as "did you take your anxiety meds today?"

46. In addition, Wilson stated, "You know you cannot become an administrator if you cannot handle the stress. Hehehe)

47. Wilson's comments about his purported anxiety greatly distressed Lucio.

48. On May 21, 2014, Laboy-Wilson, further, Wilson segregated Lucio from his co-workers, which further distressing him and the changed in assignment was sent via email.

49. On March 5, 2015, Laboy-Wilson wrote a letter to Medical and requested a physiological exam and Angela Blassman, of PER, knew of the letter before Lucio did.

50. Please Take Notice, Angela Blassman informed Lucio of the depending exam, but Blassman did not say how she knew the information. This occurred on April 8, 2015.

51. On March 27, 2015, Laboy-Wilson and Lucio had a phone conversation, at 11:32 a.m., which they discussed a depending grievance hearing. Laboy-Wilson insisted that Lucio needed to have his Chapter Leader at the meeting.

16

52. Lucio informed, via email, Laboy-Wilson that "As the member that filed the grievance, I could elect to meet with you alone. Therefore, I believe you have misunderstood **"legal's advice" because it would violate New York State's Fair Employment Act and the contract.**"

53. Upon information and belief, Laboy-Wilson lied about a rule, policy, and regulation of New York State Fair Employment Act and for the Defendants.

54. On March 30, 2015, Laboy-Wilson wrote via email, " **During the grievance hearing, I will share with you the information the DOE has provided me regarding your grievance. Please bring all the documents you wish to share with me so that we have clarity on the issue.**" This is a lie where Laboy-Wilson did not apply an official policy, regulation, ordinance or custom

55. Plaintiff now alleges, upon information and belief, that DOE Legal Services advised Laboy-Wilson to defraud and lie towards Lucio on April 1, 2015 about a rule, policy, regulation because Lucio has evidence to disprove what Laboy-Wilson told him and expose what Mandel, Esq. did to Lucio and Special Education students.

56. On April 1, 2015, Lucio met with Laboy-Wilson for the grievance related to Susan Mandel, Esq and Rosa Salcedo because Mandel falsified a grievance decision to hide the fact that Lucio emailed Mandel and provided information of how school is defrauding parents of Special Education students.

57. PLEASE TAKE NOTICE: A former teacher, Harris Lirtzman, at Lucio's school wrote a complaint to New York State Education Department about the denial of services to Special Education and school was cited for violations. Now, the school provides the services BUT

lies to the parents to change Individualized Educational Plan (known as "the IEP" and main guidelines are those set by the Federal government) to fit the needs of the school.

58. At the meeting, Laboy-Wilson had Regina Steward (School Secretary and a UFT member) attend the meeting and Lucio had Linda Brown (UFT Chapter Leader for Lucio's school) attend the meeting too.

59. Furthermore, at the hearing, Laboy-Wilson lied about the existence of the Special Education position for the summer of 2014 (Lucio has an email that stated he was hired) because the Plaintiff has evidence to prove Laboy-Wilson is a liar or DOE Legal Services told Laboy-Wilson to lie—please see paragraph 54.

60. Lucio was not provided with his contractual right of putting a preference sheet 10 before school ended because Ms. Rosa Salcedo emailed him the preference sheet on or around June 28, 2015.

61. The preference sheet had AP Government and COSA—please note that Lucio applied for this positions and he was not given these positions.

62. On April 15, 2015, Lucio received the decision from Laboy-Wilson that was based on lies told on April 1, 2015. There is physical evidence and recordings to prove Laboy-Wislon covered up the misconduct done by Mandel/Salcedo/Martinez.

63. The lies denied Lucio payment for the time he should have worked a program summer school program as a Special Education Evaluator because there are emails that states Lucio was offered a job and an email that informed Lucio not to show up to his position—WHICH was given to Mandel via an email.

18

64. The decision rendered by Laboy-Wilson is, without a doubt, an adverse employment decision and a tangible consequence because of the fact, Lucio complained to Susan Mandel of the alleged racial discrimination by Cole, Bernard, and information of misconduct done to Special Education students.    Most importantly, Morelli/Tand did not want to write this plea because of Angela Blassman of PERB—upon information and belief as well. Please be reminded, Morelli was arrested for stealing settlement money from his clients, so NOT pleading a tangible consequence is out of character for Morelli.    .

65. On July 5, 2015, Lucio asked Wilson if he could see the job postings for compensatory time teaching positions.

66. Compensatory time teaching would benefit Lucio by reducing his teaching load, which is called "COSA".   The position required teaching skills plus skills that are not part of a regular teaching position, like planning for prom, senior activities, and graduation ceremony.

67. Lucio believed Wilson possessed the compensatory time job postings at the time of his inquiry.

68. Lucio was entitled to see the requested compensatory time job postings under his union contract.

69. Wilson did not provide Lucio with the compensatory time job postings.

70. Instead, two days later, Wilson sent a request to the Medical Administration of the New York City Department of Education asking that Lucio report for a psychological exam, to be administered on August 17, 2015.   The letter that was faxed to the medical administration on July 7, 2015 ordering Lucio to report for a psychological examination was inexplicably dated March 5, 2015.   In the letter, Wilson falsely claimed that Lucio informed her that he was not

taking his psychological medications, when in truth Lucio never told her this. As a result, Laboy-Wilson deprived Lucio of his privacy.    Lucio didn't receive this letter requesting him to submit to the Psychological examination until on or about July 24, 2015.

71. On information and belief, Wilson ordered the psychological exam on the basis of her regarding Lucio as having a disability: anxiety

72. The purpose of the exam was to determine Lucio's fitness for teaching.

73. After Wilson's order to take the psychological exam, Lucio felt he had no choice but to disclose his immune disorder, HIV, to his superiors. He did so in mid-July 2015.

74. Lucio also protested Wilson's order to take the exam to his superiors.

75. Even after he did so, he was informed by his superiors that he still had to take the psychological exam.

76. On August 17, 2015, Lucio reported for the psychological exam and was informed by the psychologist that there was "nothing wrong" with him. In addition, the psychologist attempted to have Lucio believe that he was the problem for the criminal activity that he incurred by NYC Doe Legal (Defendants)---audio recording.

77. In the 2015-2016 school year, Lucio continues to be segregated from his co-workers; Lucio is the only teacher in the school having to teach by traveling around the school with a roving cart, whereas the other teachers have classrooms, although Lucio's seniority entitles him not to teach out of a cart.

78. Upon information and belief, Lucio deprived of an empty room because he threatened to file EEOC charges.

79. On or around September 8, 2015, Lucio received his program for the 2015

80. Lucio was deprived the positions of COSA and AP Government.

81. Each position was still on a teacher line, but the position came with prestige, the positions came with different responsibilities than just a regular teaching position, and training.

82. The responsibilities would have advanced his career in the end because the positions would have set him apart from regular teachers.

83. The program given to Lucio was, without a doubt, an adverse employment decision and a tangible consequence because of fact Lucio complained of Laboy-Wilson's misconduct. Most importantly, Morelli/Tand did not want to write this plea because of Angela Blassman of PERB. Please be reminded, Morelli was arrested for stealing settlement money from his clients.

84. On information and belief, the above described hostile and intentional actions by Wilson against Lucio and was motivated by disability discrimination that she either mistakenly regarded him as having and/or that he actually had; and by retaliation for his opposing unlawful discrimination in being compelled to undergo a psychological exam.

### *Race Discrimination*

85. Lucio is a Caucasian male.

86. Lucio taught an adult evening class at the Bronx Adult Learning Center (the "Center"), during 2013-2014.

87. Principal Anne Bernard ("Bernard") was Lucio's supervisor at the Center.

88. Richard Cole ("Cole") was Lucio's supervisor and an administrator who evaluated teachers at the Center.

89. Lucio was the only Caucasian teacher at the Center during 2013-2014 school year.

21

90. The other four teachers at the Center during 2013-2014 are non-Caucasian.

91. Bernard and Cole are non-Caucasian.

Issue/Controversy:

Did Cole deprive Lucio of his contractual rights in teachers' evaluation system?

Did Cole deprive Lucio of procedural due process rights in teachers' evaluation system?

Did Cole have the authority to create a rubric and change any procedures in teachers' evaluation process?

Did Cole act in bad faith as he preformed and modified contractual relationship between New York City Department of Education and the United Federation of Teachers?

Did Cole treat Lucio differently because of his race/national origin versus the other teachers (3 African-Americans teachers and 1 Hispanic teacher) at the site?

Did Cole falsify observation reports to procure an adverse rating?

Did Cole intentionally misrepresent the facts?

92. To state a claim for Title VII

1) Lucio was the only Caucasian and Italian descent at the site Cole supervised;

2) Lucio was qualified for his position because Lucio yielded positive student growth on exams with his students versus the other the African-American teachers and the one Hispanic teacher that did not yield the same results on exams, and Lucio applied for a position in the Office of Continuing Adult Education but was denied a position in the said program;

3) Lucio suffered an adverse employment action because Cole intentionally used an illegal rubric and deprived Lucio of his due process rights in teachers' evaluation system to procure an adverse

rating for which he was applied. In addition, the adverse rating affected Lucio's other employment opportunities because the adverse rating impeded his employments in programs not run by the Office of Continuing Adult Education; and

4) The teachers that did not yield the same success on exams were not a member of Lucio's protected group and these teachers were treated better and Lucio treated differently because Cole used an illegal rubric that did not affect the African-American teachers or the Hispanic teacher.

93. Disparate treatment; Cole did not provide Lucio with the new TASC book (new test for the GED)

    a. Cole conducted observations of Lucio at 6:00pm versus the other teachers, which Cole provided the other a choice of timepolicies or practices that presently perpetuate the past effects of discrimination;

    b. There are policies that are written by the Office of Appeals and Review to conduct evaluations/observations, which is written into "Appeals Process Manual."

    c. The Appeal Process Manual describes what needs to take place prior to the pretermination hearing (also known as "Loudermill hearing).

94. Upon information and belief, the Appeals and Review Manual and the appeal hearing date are requirement to fulfill the employer's obligation for Cleveland Board of Education v. Loudermill.

95. Please take notice, the Office of Appeals and Review Office, per their manual, has a quality control function for the appeal hearing date, as no unsigned document will be allowed at the hearing because it is the policy that only signed documents can be considered at this

hearing—this did not occur prior, during, or after Lucio's appeal of his adverse rating because documents lacked Lucio's signature.

96. Plaintiff alleges, the practice at the pretermination hearing is to allow school administrators to submit any documents without the Office of Appeals and Review doing any type of quality control or honoring arbitration decisions or the collective bargaining agreement.

97. Plaintiff alleges, the practice of ignoring Appeals Process Manual, written and put out by the Office of Appeals and Review, perpetuates misconduct of school administrators and their discriminatory conduct goes uncheck by New York City Department of Education.

98. Please see the section of Loudermill hearing for more claims/allegations

99. To state a claim for U.S.C 1981:

a) Lucio alleges deprivation of his contractual rights caused by racial discrimination because Cole used an illegal rubric to evaluate Lucio's teaching.

Cole did not have the authority to make and enforce his rubric because the United Federation of Teacher and New York City Department of Education did not negotiate or agree to Cole's rubric Lucio alleges the illegal Cole was intentionally created to procure adverse rating, which Lucio alleges was racially motivated because the illegal rubric only affected Lucio and not the other African-American teachers.

100. Plaintiff alleges Cole did not perform observations as described in "Rating of Pedagogical Staff Members", which is a publication put out by the Office of Appeals and Review and teacher's evaluation systems are a mandatory subject of negotiation.

24

101.   Upon information and belief, school administrators must be fully aware of the regulatory parameters subsumed under Rating of Pedagogical Staff members because it Defendants' policy and any publication that affects the employment relationship is a mandatory subject of negotiation.

102.   Plaintiff alleges that Cole modified the evaluation procedures to procure an adverse rating and to deny Lucio of his contractual rights, which Cole did not have, the authority to change the contact between the United Federation of Teachers and New York City Department of Education.

103.   Plaintiff alleges Cole illegal performance and modification of the contract between the United Federation of Teachers and New York City Department of Education was meant to deprive Lucio the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, which the Lucio was racially motivated

104.   Plaintiff alleges he was deprived of his contractual rights which, under similar circumstances, would have been accorded to a person of a different race

105.   Plaintiff alleges, Cole's illegal rubric had a disparate impact on Lucio's employment because Cole's illegal rubric can be used in a termination hearing and the adverse rating from the illegal evaluation system has impeded Lucio's employment opportunities.

106.   Plaintiff alleges, the illegal rubric was Cole's purposeful intent to discriminate, because the United Federation of Teachers and New York City Department of Education did not agree upon the rubric created by Cole.

107.   To state a claim for U.S.C 1983:

1) Cole was acting under the color to law when he conducted observations (evaluation) of Lucio's teaching, and teachers' evaluation systems are part of teacher's due process rights under New York State Fair Employment Act (also known as "the Taylor Law" or the "Article 14") and evaluation systems (all aspects) is a mandatory subject of negotiation, which the United Federation of Teachers and New York City Department of Education did not agree to the rubric Cole created.

108.    Cole took a State action to deprive Lucio of his due process right in teachers' evaluation system because the intent was to procure an adverse rating, which denied Lucio future employment in the Office of Continuing Adult Education (also known as "OCAE").

109.    Plaintiff alleges Cole violated Lucio's rights under the equal protect clause of the due process clause because Cole created an illegal rubric and deprived Lucio of due process in teachers' evaluation system because the evaluation system created by and/or modified was arbitrary, discriminatory, and wrongful government actions because Cole did not adhere to a policy written in "Rating of Pedagogical Staff member.

110.    Plaintiff claims under the procedural component of the due process clause that Cole's illegal rubric and deprivation of due process right in teachers' evaluation system led to Lucio' s deprivation of life, liberty, or property without fair procedure.

111.    Plaintiff alleges that he has been deprived of liberty, and property interests by Cole because as an official acting pursuant to established state/agency procedure, failed to provide for predeprivation process in a situation where such process was possible, practicable, and constitutionally required.

112.    Plaintiff alleges that the erroneous deprivation by Cole was foreseeable because Lucio informed Mandel on July 17, 2014 in an email and to Jackson-Chase in numerous emails.

113.    Plaintiff alleges that the predeprivation process of investigation would have uncovered that Cole created his own rubric which he stole the language Charlotte Danielson, who is the creator of the Danielson Rubric because Lucio informed Mandel and Jackson-Chase of the illegal rubric and contractual violation, was practicable to avoid liability.

114.    Plaintiff claims that he has liberty and property interests, which is derived directly from New York State Fair Employment Act (also known as "the Taylor Law")—teachers' evaluation systems are mandatory subjects of negotiation—because the interests are created from an independent source such as state law determining the sufficiency of procedural safeguards accompanying deprivations caused by the state. The property and liberty interests under the Taylor Law are mandatory subjects of negotiation, like work rules, teachers' evaluation system, and any publication that affects employment relationship.

115.    Elements of Procedural Due Process Claims

    a.    Lucio's interest in maintaining a job and job opportunities was affected by the official action;

    b.    Cole's illegal rubric and violation in the evaluation system caused a risk of an erroneous deprivation of such interest through the procedures used, and; (3) In this case, the Government's interest, including the function involved and the fiscal and administrative burdens that an investigation would have solved the matter simplify and efficiently.

116.    due process requires some notice and an opportunity to be heard prior to the deprivation of a protected interest

117.  Upon information and belief, there is "clear and unambiguous" language of the contract regarding the need for separate and distinct conferences before (pre-observation) and after (post-observation) a formal observation.

118.  Plaintiff alleges, Cole denied Lucio a pre-observation conference because contractually, the conference must focus on the specific content of the lesson to be observed and the areas to be evaluated.

119.  Plaintiff alleges, Cole knew the structure of the Lucio's class and intentionally violated the coaching session to procure an adverse rating.

120.  Plaintiff alleges, Cole denied Lucio the pre-observation conference because this would have given Lucio the opportunity to discuss his lesson prior to the formal observation and allow Lucio to contractually ask Cole for a lesson specific evaluation.

121.  Plaintiff alleges, Cole denied Lucio, which is confirmed through court and arbitration decisions, that there are the important roles of the pre- and post-observation conferences in supporting a teacher's professional growth and contractually required, especially for teachers endanger of an end-of-the-year rating of an Unsatisfactory.

122.  Upon information and belief, the formal observation report without a scheduled pre-observation and post-observation cannot be considered in determining the teacher's overall rating for that school year.

123.  Upon information and belief, unsigned observation reports cannot be considered in determining the teacher's overall rating for that school year.

124.    Plaintiff alleges, Cole did not announce formal observations in advance and Lucio lacked notice of the formal observation, which is clear violation of the contract.

125.    Plaintiff alleges, Defendants are liable for Cole misconduct when he created his rubric to evaluate and deprive Lucio of his due process in teachers' evaluation system, which is a contractual right.

126.    Plaintiff alleges, Defendants are liable for Cole because the Defendants failed to train and supervise Cole on conducting observations under "Teaching for the 21th Century" model, which is a contractual right.

127.    Plaintiff alleges, Defendants are liable for the lack of discipline Cole received when he disregarded his conduct of altering observations under "Teaching for the 21th Century" model, which is a contractual right.

128.    Plaintiff alleges, Defendants inadequate training and supervision of Cole amounted to 'deliberate indifference' and 'gross negligence' on the part of the officials in charge.

129.    Plaintiff alleges, Cole violated an established the municipal policy in observations, which was the "moving force" behind the constitutional violation and the said violation is also a contractual right Lucio has as well.

130.    Upon information and belief, Justice Sandra Day O'Connor said, "where there is "a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face, . . . failure to inform city personnel of that duty will create an extremely high risk that constitutional violations will ensue." This would entail observations and the receipt of misconduct by an agency official.

131.   Plaintiff alleges, Cole's, a subordinate in the organization, decision could be attributable to the government entity because Jackson-Chase, as the "the authorized policymaker, approved the decision and the basis for it because she simply going along with discretionary decisions made by one's subordinates.

132.   Plaintiff alleges, Cole's misconduct is affirmatively linked to the action or inaction of the supervisors, like Bernard and Jackson-Chase.

133.   Cole did not follow established polices for "formal and informal observations" written in a memorandum by the Office of Labor Relation.

134.   Cole did not follow "Chief Executives' Memorandum #80."

135.   Cole did not follow established protocols provided by Division of Human Resources.

136.   Upon information and belief, Established protocols are found in a book entitled "Rating Pedagogical Staff Members."

137.   While Lucio was teaching at the Center, Cole denied him the books that he needed for his students; whereas the other non-Caucasian similarly situated teachers were not denied the same books.

138.   While Lucio was teaching at the Center, Lucio was the only teacher to show positive student growth for three students because the three students moved on into higher levels in the program; whereas the other non-Caucasian similarly situated teachers did not have the same success with their students. To Lucio's knowledge and information, only Ms. Morrison had one student move up a grade level and the other teachers DID NOT anyone move up a grade level.

139.    Plaintiff theory, Cole used his fraudulent observation system, as a ruse, to rid of Lucio from the adult education program because it was the only way to justify not to rehire Lucio in the program.

140.    Furthermore, although the Center required all the teachers to arrive by 6:00 p.m., Cole allowed Lucio's similarly situated non-Caucasian co-workers to arrive at 6:45 p.m. However, Lucio was required to be at work at 6:00 p.m.

141.    Moreover, each time Cole conducted an evaluation of Lucio, he started the evaluation while Lucio was setting up to teach, which had an adverse effect on Lucio's ratings.

142.    Plaintiff alleges, Cole DID NOT, nor was any evidence produced at the May 4, 2015 appeal hearing date,    provided Lucio with objective feedback because the intention was not to have Lucio sufficiently improved his performance and to avoid Unsatisfactory rating with the non hiring him back into the program.    Cole breached his duty to use ordinary care in conducting performance evaluations because his DID NOT conform to rules, regulations and policies for New York City Department of Education.

143.    In contrast, Lucio's similarly situated non-Caucasian co-workers at the Center were allowed time to set up before they were evaluated by Cole.

144.    Cole's evaluations of Lucio were improper, as they were based on defective evaluation procedures or intentionally false.

145.    Prior to May 6, 2014, Cole was required by contract, regulation/policy/rule to provide Lucio with a one-to-one conference between supervisor and teacher to discuss the focus(es) of the content for the lesson and areas to be evaluated. (According to Bernard, this occurred on or around September 15, 2013, which IS A DATE that predated Lucio's employment with

31

OACE. In addition, this conference is based on informal observations done prior to the formal observation for teachers endangered of receiving a U-rating.)

146.    On May 28. 2014, Cole held a feedback session with Lucio for the lesson that Lucio taught on May 6, 2014.

147.    The following conversation took place between Cole and Lucio (Defendants have a copy of the audio recording because Lucio already sent it to them via email)

    a.    Cole: Alright, this is the formal that I wrote up. You know, one of the things that I've stated in the, the informal observations, I definitely want to see more improved work, I want to see more students engaged in class. On this observation I did not see that. Now, in saying that, you know I have seen you do that. I did two informals and one formal, so I have seen that. But in the formal I did not see that. So, you know one of the things that, I'm going to just read what I wrote.

        i.    Plaintiff alleges that the formal observation was not discussed prior to Cole conducting it, which is a violation of Lucio's contractual rights because of Cole's informal observational reports indicated deficiencies and did not adhere to regulations/policies/rules for formal observations

        ii.    .Plaintiff alleges that Cole's conduct here forms the nexus for Lucio's USC 1981 Claim and USC 1983 Claim

    b.    Cole: "...Okay, seven students were in attendance and they had to start with a free-write. As you left the room students said, "I don't know what to write and I don't really care." You know, and you returned back to the room six minutes later and a majority of students were finished with the free-write. You asked students to answer

"why" to the response given. The lesson should have started off by you asking "What's needed when you do a free-write."" You know, a lot of them didn't really understand, "okay, what's a free-write?"

   i.  Plaintiff alleges that Cole misrepresented the fact of "…students said, 'I don't know what to write and I don't really care'." There were just two students that stated that they did not know what to write, BUT never stated I don't care. Lucio has names of students that made this statement, which Cole conveniently left of the report to procure adverse rating.

   ii.  Plaintiff alleges, Cole understood Defendants' regulations/rules/polices for observations because Cole stated "…they had to start with a free-write," which IS NOT lesson. Cole has been educator for a long enough time to know that every lesson plan starts with a Warmup/Do Now before the actual lesson begins.

   iii.  Plaintiff alleges that Cole misrepresented free-write, warm up activity, as the lesson to procure an adverse rating because the Defendants' policy is to focus on the actual lesson being taught and no one models during the Do Now and Cole knows this as a matter of fact.Plaintiff incorporated feedback into Do Now, in the written lesson plan, because Cole's feedback in the informal was the lack of feedback. This is also where Lucio modeled for the students that did not understand.

148.   This is the exact misrepresentation by Cole "…The prompt, well they didn't, they didn't understand it. So, then you say, "We were were supposed to do articles but we will do that

33

tomorrow. Those of you who have trouble writing, just start writing," You said to them, 'cause you have to, you have to, you have to remember you have to, you have to model that. And I don't care if you modeled it a hundred times before, you have to model it each and every time, you teach those particular skills. 'Cause they're going to be stuck. "So we will start prepositions today because my page did not copy right." You went into saying, you went into ask, "What is a pronoun?" "Name the person without using their name." "What is an interrogative pronoun? A preposition that makes two, makes, turns into "whom"." So a preposition makes "who" which turns into "who","whom," I'm sorry.

    i. Plaintiff alleges that Cole knowingly did not write in the evaluation report, where Lucio went around the room to coached/modeled for the students to produce a piece of writing. Two students were stuck (out of the twenty students that completed the task) , at first, but they were able to write and READ ALOUD their writing, as well. HOWEVER, Cole DID NOT record the said actions because Cole (with malice) wanted to procure a U-rating. Cole was in room and this part of the activity took over 10 minutes.

    ii. Plaintiff alleges that Cole did not write how Lucio coached/modeled for the students individual (whether they understood the prompt or did not understand the prompt) because Cole wanted misrepresent did not show or teach the students anything. Lucio went around the room and conference with each student for a period of at least 10 minutes, but Cole did not write this into the report. Plaintiff alleges that Cole did not write that Lucio coached/modeled/conferenced with the students because this would have shown that Lucio did, in fact, scaffold the

learning so that the students could and did overcome their lack of understanding to produce a piece of writing.

149.    This is another misrepresentation by Cole: "…Also you have to be teaching for the whole three hours, so, you know the break, walking out of classroom, doing this, that can't happen. I spoke to you about that before also.

150.    Plaintiff alleges, Cole forgot to write that Lucio had to pick up materials from the Bronx Adult Learning Center because Cole kept on forgetting material that Lucio requested and Bernard said it was the site supervisor's job to get materials.

151.    Plaintiff alleges that this is the first time that Cole stated anything about breaks—Cole lied about "I spoke to you before also" because Lucio continued with the policy of the previous supervisor, which was to provide students with a 5 minute break in the middle of the three hours. During the break, the teacher could go to the bathroom too.

152.    Cole: "…(following is in reference to the rubric Cole created)"So, one of the things I did, you know, I broke it down, "demonstrating knowledge of content," it was fair. "Demonstrating knowledge of students," I had one. "Setting them up for outcomes.."

a.    Plaintiff alleges Cole violated Lucio's contractual rights in the evaluation system because Cole knowingly altered terms and conditions of evaluation system. Evaluation systems are deemed part of teachers' due process rights and unions have to agree to the documents used with the procedures used, which is under New York State Fair Employment Act (Taylor Law) Because Cole created his own rubric, Lucio has an actionable 42 USC 1981(b) claim because Cole (with his rubric) tried to affect Lucio's rating through the use of his illegal rubric.

153.   UPON INFORMATION AND BELIEF, actionable 1981 claims are violated when employer make and enforce a contract which includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship—Cole DID NOT have the right.

154.   Because Cole created his own rubric, Lucio has an actionable 42 USC 1983 claim, as UFT has to agree to any evaluation system created for evaluation

155.   Cole: "So this lesson was an unsatisfactory lesson, but I'm going to give you a chance to right this. I'm going to come in again, I'm going to come in again next week......and do another, another formal observation. You understand

156.   In addition, Cole DID NOT write how Lucio coached, which is in Lucio's lesson plan, the students with feedback because it was one of Cole's checks in the no column and the students DID produce a writing sample.

157.   Cole wrote that the free-write as the lesson, which was, in fact, just the warm up activity and another misrepresentation by Cole.

158.   Upon information and belief, the most stringent legal standard applied to performance appraisal procedures has been the belief that they should be considered "tests" and therefore fall under the Uniform Guidelines on Employee Selection Procedures (1978).

159.   Upon information and belief, Cole and his rubric would not meet the standards of Federal Rule 702 because trial courts must act as a 'gatekeeper' to exclude 'junk science' that does not meet Rule 702's reliability standards.

160.   At the above-referenced feedback session, Cole promised to conduct an additional observation and provided about 4 minutes of feedback on a lesson that Cole stood in the room for over 50 minutes.

161.   Plaintiff alleges, Cole's "good faith gesture of an additional observation to improve Lucio's rating" is only pretext to cover up lies Cole told Lucio on May 28, 2014 because Cole did not fulfill promise of conducting an additional observation.

162.   Plaintiff alleges, Cole did not discuss any of the observation reports prior to showing Lucio for his signature.

163.   Upon information and belief, Cole's poor evaluations of Lucio reflected his racial bias against Lucio because Cole's evaluation system only impacted Lucio and the evaluation system did not affect other teachers of color.

164.   Lucio has excellent teaching qualifications to teach adults based on his degrees and years of teaching experience.

165.   Lucio has taught in New York City schools for sixteen (16) years.

166.   Lucio has also been a mentor and staff developer for other teachers.

167.   Lucio possesses two (2) teaching licenses: a high school teaching license and a special education K-12 license, both of which are appropriate to teach adults.

168.   The other teachers at the Center, who are non-Caucasian, all possessed common branch teaching licenses, which are intended only for grades K-6.

169.   Yet the other Center teachers, who were non-Caucasian, who did not have Lucio's teaching qualifications, all received good evaluations from Cole.

37

170.   Cole did not follow established polices for "formal and informal observations" written in a memorandum by the Office of Labor Relation.

171.   While Lucio was teaching at the Center, Lucio was the only teacher to show positive student growth, for students on standardized exams given by the Center; whereas the other non-Caucasian similarly situated teachers did not have the same success with their students.

172.   Upon information and belief, in fact, there were two BE3 classes at Lucio's site and the other BE3 classroom did not have a single student move up a level.

173.   To Lucio's knowledge and information, only Ms. Morrison had a student move up a grade level and the other teachers DID NOT show any gains for their students.

174.   Cole breached his duty to use ordinary care in conducting performance evaluations because his DID NOT conform to rules, regulations and policies for New York City Department of Education .

175.   Cole's evaluations of Lucio were improper, as they were based on defective evaluation procedures or intentionally false.

176.   Prior to May 6, 2014, Cole was required by contract, regulation/policy/rule to provide Lucio with a one-to-one conference between supervisor and teacher to discuss the focus(es) of the content for the lesson and areas to be evaluated. (**According to Bernard, this occurred on or around September 15, 2013, which IS A DATE that predated Lucio's employment with OACE. In addition, this conference is based on informal observations done prior to the formal observation for teachers endangered of receiving a U-rating.**)

177.   Even without the conference, Cole came into Lucio's room daily and knew the constructs Lucio's routines and lesson—this could be heard on the audio recording--, therefore, Cole

could have provided objective feedback before the formal observation, BUT Cole did not provide Lucio this because Cole had the intentions of procuring an adverse rating.

178. At the above-referenced feedback session on May 28, 2014; Cole promised to conduct an additional observation and provided about 4 minutes of feedback on the warm up activity and not the lesson itself. PLEASE TAKE NOTICE, Cole stood in the room for over 50 minutes AND only had 4 minutes of feedback to provide Lucio—Plaintiff alleges that Cole was TOO busy on his IPhone and did not pay any attention towards the lesson being taught by Lucio.

179. Cole did not apply an official policy, regulation, ordinance, or custom of conducting an evaluation for a full class period because the class period was an hour an half for English and an hour and a half for math—remember Cole only stood in the room for 50 minutes.

180. Lucio cannot find an official policy, regulation, ordinance, or custom of playing on the phone as acceptable.

181. The "good faith gesture of an additional observation to improve Lucio's rating" is only pretext to cover up lies told by Cole to Lucio on May 28, 2014.

182. Cole did not discuss informal observations or provide Lucio with objective feedback after each in formal observation, which means did not apply an official policy, regulation, ordinance, or custom as Cole handed Lucio the write up of the observation.

183. Cole did not discuss any of the observations prior to showing Lucio for his signature, which means Cole did not apply an official policy, regulation, ordinance, or custom.

184. Cole did not fulfill promise of conducting an additional observation because Cole did not want to which means Cole did not apply an official policy, regulation, ordinance, or custom .

185.   On information and belief, Plaintiff alleges Cole's poor evaluations of Lucio reflected his racial bias against Lucio.

186.   Lucio possesses two (2) teaching licenses: a high school teaching license and a special education K-12 license, both of which are appropriate to the adult high school students in the Center's classes.

187.   The other teachers at the Center, who are non-Caucasian, all possessed common branch teaching licenses, which are intended only for grades K-6 (elementary school).  The test for the GED is based on knowledge gained in high school.

188.   Yet the other Center teachers, who were non-Caucasian, who did not have Lucio's teaching qualifications, all received good evaluations from Cole.

**First Informal Observation Report Dated 3/4/14:**

189.   Based on memory, March 3, 2014 was within Cole's first week at the site.

190.   Plaintiff alleges that Cole misrepresented facts to procure adverse rating because many checkmarks for yes or no required Cole to sit with Lucio and ask Lucio questions or provide Lucio with time to show the evidence for each checkmark.

191.   Cole did not want to apply an official policy, regulation, ordinance, or custom of objective feedback as part of the evaluation system, which is part of "Rating Pedagogical Staff Members," because Cole wanted to procure an adverse rating against Lucio

192.   PLEASE TAKE NOTICE, Cole's objective feedback did not address any deficiency that Lucio had during teaching the lesson Cole observation. Plaintiff alleges that this was done to procure an adverse rating.

193.   PLEASE FURTURE TAKE NOTICE, objective feedback is meant to improve a teacher's practice/craft because it is the only way to yield positive results on state exams!! In denying Lucio's statutory right of due process, Cole, in fact, deprived the students a chance for Lucio to improve his art of teaching students.

194.   Cole only provided the following objective feedback to Lucio: "Also, lesson plan must be visible at all times," Also, allow students to work in groups more, and "Reviewing main idea with your students."

195.   PLEASE TAKE NOTICE, Cole did not want to explain how a PAIR is not a group, which is written into Lucio's lesson plan and Cole collected!!!  Also, this is only "no" that Cole addressed in his objective feedback.

196.   Cole checked off that Lucio did not have "Teachers have students (ISRF/ASIST)," as being "no".

197.   PLEASE TAKE NOTICE, all teachers were give a file box to put testing data sent from Bronx Adult Learning Center into it, but Cole never asked Lucio to see the file box and Cole personally gave Lucio the said data each and every time a new student came in the class.

198.   Cole checked off that Lucio did not "use of tech where applicable," as being no. The previous site supervisor and the regular assistant principal of Emolior during the day said that teachers were not allowed to use computers at the school.

199.   PLEASE TAKE NOTICE, Ms. Stossel was a computer teacher at Cole's day school and brought over computer equipment to use in the program. Lucio asked Cole to get him the equipment and Cole said no because it was not his job.

41

200.    Cole checked off that Lucio DID, in fact, have his lesson plan visible. Part of the objective feedback, HOWEVER, Cole wrote, "Also, lesson plan must be visible at all times." Remember, objective feedback needs to focus on areas that Lucio needed to improve.

201.    According to Cole, Lucio's lesson plan is aligned to the curriculum

202.    PLEASE TAKE NOTICE, Lucio DID NOT have a curriculum on March 4, 2014 because the Bronx Adult Learning Center did not have a curriculum yet. The Center did not have one yet because the curriculum was changing over from GED to the TASC.

203.    Upon information and belief, Cole misrepresented the facts to procure an adverse rating. Second Informal Observation Report Dated April 23, 2016:


204.    Plaintiff re-alleges many of the previous pleas for the first informal observation in the second informal observation.

Except the following occurred as well:

    a.  Lucio was never asked to see a lesson plan, but Cole wrote Lucio did not have one

    b.  Cole checked that Lucio had a curriculum map for the first observation and then stated for the second observation that Lucio did not have a curriculum map.

        i.   A curriculum is for an entire year

        ii.  Lucio did have a curriculum map for the second observation, but Lucio did not have a curriculum map for the first observation

        iii. Cole never asked to see a curriculum map

42

    c.  There are other misrepresentation but Your Honor has a problem with Rule 9 because he wants criminal to be free and on the street.

205.   Cole did not provide a copy of this observation report because Cole did not want to apply an official policy, regulation, ordinance, or custom of the Defendants.

206.   Cole did not want to apply an official policy, regulation, ordinance, or custom of the Defendants because Lucio needed the reports to reflect and fix the deficiencies seen by Cole.

207.   According to Cole, Lucio did not have a curriculum this time around.

208.   PLEASE TAKE NOTICE, Lucio did, in fact, have a curriculum to show Cole on April 23, 2014 because to was a checkmark for "no" on the March 4, 2014.

209.   Therefore, Cole's statements of the curriculum was made with actual knowledge of or reckless disregard as to its falsity of statements in the observation reports because Cole wanted to procure an adverse rating and Cole's conduct was to defame Lucio as well.

210.   PLEASE FURTHER NOTICE, Cole never asked Lucio to see or inquire if he did, in fact, have a curriculum on March 4, 2014 OR on April 23, 2014.

211.   Plaintiff moves Judge Bloom to view a curriculum like a syllabus. The difference is a curriculum is for an entire year and a syllabus is for a semester. [1]

212.   Plaintiff motion the Defendants to produce the curriculum Cole saw on March 4, 2014 pursuant towards Federal Rule 65.

213.   Plaintiff alleges that the misrepresentation done by Cole is fraud and a white-collar crime.

214.   Upon information and belief, Defendants did not apply an official policy, regulation, ordinance, or custom because Defendants terminate employees based on New York City

---

[1] Plaintiff understand that Judge Bloom teaches at Columbia Law and Lucio would like her to relate to what Cole did to him.

Charter of 1116(b) and even requested arbitration hearing office look towards New York State Penal Code ("Although DOE requested that the Hearing Officer take judicial notice of two sections of the Penal Law"), which the New York City Law Department defended in New York State Supreme Court.

215.    Plaintiff alleges, Cole did not follow procedures for Domains 2 and 3 of the Framework describe classroom practice, and can be assessed through observations of teaching. These observations can (and I think should) be supplemented by samples of student work, which also provide another indication of student engagement in challenging work.

216.    Plaintiff alleges, Cole did not follow procedures for Domains 1 and 4 represent "behind the scenes" work, important to good teaching, but not directly observable in the classroom. Observers can, occasionally, obtain indirect evidence of Domain 1 (Planning and Preparation) during an observation, but more direct evidence is obtained from planning documents, and a pre-observation (planning) conference. As for Domain 4 (Professional Responsibilities), there is rarely evidence for that in an observation, simply because those activities don't happen in the classroom. Domain 4 is best assessed through the examination of artifacts that illustrate the teacher's skill in the different components of the Domain. And while Domain 1 can, if there's time to do so, be discussed in reference to every (announced) observation, I recommend that the components of Domain 4 be assessed annually.

217.    Plaintiff alleges, Cole did not comply with Danielson's framework: In high stakes teacher evaluation, evaluators must make consequential decisions about teachers, decisions that could affect ratings, compensation, or even their continued employment. For that reason, it's essential that evaluators demonstrate that they can evaluate performance accurately and

44

consistently, and base those judgments on evidence. These skills can be both taught and tested, and in my view a fair system demands that evaluators pass, in effect, a test to demonstrate their skill. After all, it's impossible get a driver's license in any state without passing a test; it does not make sense that school evaluators should be able to make high stakes decisions about teachers without demonstrating that they can do so accurately.

218.  Plaintiff alleges, Cole did not follow the observation cycle: The Danielson Group recommends a "collaborative observation cycle" process, and it applies to a formal, announced observation. It consists of the following steps: A pre observation (planning) conference, following an established protocol, in which the teacher explains what he/she is planning for the students to learn, how the teacher proposes to engage students in the lesson, and how (and when) the teacher will know whether the students have reached the desired outcome; A classroom observation, for an entire lesson or class period. The observer takes notes, recording only evidence, and not making any interpretations or judgment of that evidence; A period of consolidation, in which: 1) the observer shares the notes with the teacher, and the teacher has an opportunity to supplement the observer's notes if they are not complete 2) both teacher and observer assign each piece of evidence to a component in the *Framework for Teaching*. If applicable, a single piece of evidence may be assigned to more than one component 3)both teacher and observer determine which level of performance they believe is represented by the evidence for each component, and why they think that. A recommended technique is for each individual to use a highlighter (either on paper or electronically) on the rubric to represent the words that best characterize the evidence for each component 4) a post observation (reflection) conference in which the teacher and

observer compare their interpretations of the evidence for each component, and together decide the appropriate level of performance for each component. If they disagree, the observer's judgment must prevail, but the observer should have sufficient humility to recognize that the teacher's interpretation may be the correct one 5)together, the teacher and observer identify the strengths of the lesson, the areas for growth, and recommended actions the teacher might take to address the areas for growth.

219.    Plaintiff alleges, Cole did not follow the procedures for insufficient evidence : In a full lesson, a teacher will demonstrate most of the components in Domains 2 and 3. However, this is not always the case, when, for example, the lesson does not include the need for a teacher to make an adjustment to the lesson (3e.) Furthermore, in a brief observation, there may be no evidence for several components. For example, it's possible that in the particular 15 minutes observed, the students were not engaged in a discussion (3b) or there were no transitions or other evidence of classroom procedures (2c.) **In situations where there is no evidence for a component, it should be recorded as "no evidence;" the lack of evidence should not result in a low score for that component.**

220.    Plaintiff alleges, Lucio will show that Cole: (1) that the defendant was actually aware of the infringing activity; or (2) that the defendant's actions were the result of `reckless disregard' for or 'willful blindness' to the copyright holders' rights."


Bernard

Issue/Controversy:

46

Did Bernard deprive Lucio of his contractual rights to contents in Lucio's personnel file, like observation/evaluation reports?

Did Bernard have the authority to deny Lucio access to Lucio's personnel file?

Did Bernard retaliate against Lucio when Lucio informed Bernard of Cole's misconduct in the evaluation process?

Did Bernard treat Lucio differently because of his race/national origin?

Did Bernard conceal the first observation/evaluation report to hide Cole's misconduct because it would provide discriminatory intent?

Did Bernard conceal documents that Lucio had signed for or his personnel file and the appeal of Lucio's adverse rating?

Did Bernard submit fraudulent documents for the appeal hearing on May 4, 2015?

Did Bernard lie about meetings between Lucio and Cole because Cole did not do anything to improve deficiencies he had cited in observation reports?

221.    Upon information and belief, Lucio was entitled to his observation reports: "With respect or any other document containing expressions of supervisory evaluation or judgment (Lease, 2-76; Goldstein 4-77) AND this is a requirement for Cleveland Board of Education v. Loudermill.

222.    In the above-referenced arbitration decisions, the case states the following and Plaintiff alleges that the Defendants deprived Lucio of his rights :

        a.    A grievant factual statements in the observation report are challengeable as to accuracy.

b.  Where it is established by evidence that a statement of supervisory judgment and its factual under-pinning must be expunged from the letter.

223.  Bernard/Cole did not provide copies of the second informal observation report and the formal observation because Bernard/Cole did not want Lucio to gather evidence to challenge facts or reports accuracy and to commit a crime against Lucio, which means Berand/Cole did not apply an official policy, regulation, ordinance, or custom of the Defendants because the reports were withheld from Lucio until May 4, 2015.

224.  Because of Cole's unjustified (because of evidence) poor evaluations of Lucio, Bernard denied Lucio a summer teaching position at the Center.

225.  On information and belief, seniority was the basis for hiring summer school teachers at the Center.

226.  Lucio had more seniority than the four (4) non-Caucasian teachers who were hired for the summer instead of Lucio, one of whom replaced him.

227.  On or about June 25, 2014, Lucio received a "U" or Unsatisfactory rating from Bernard.

228.  Under the rules and procedures of the DOE, prior to the issuance of a "U" rating, a principal must advise a teacher he is in danger of receiving a U rating and must conduct a formal observation prior to issuing the U rating.

229.  Bernard did not advise Lucio would be receiving a U rating, if he did not improve.

230.  Bernard did not conduct a formal observation of Lucio prior to issuing the U rating, which is a policy, custom, and regulation for the Defendants.

48

231.   Upon information and belief, employee is entitled to copies of any or all material in his/her. At arbitration, it was established that the cost of such reproducing cannot e charged to the employee (Knoff, 12-78).

232.   Therefore, Bernard/Cole/Jackson-Chase/Barnello/FOIL Unit/UFT did not apply policy, custom, ordinance, or regulation when Bernard/Cole withheld documents from Lucio to commit a crime because Lucio received the documents on May 4, 2015.

233.   Lucio appealed the U rating to the DOE Office of Appeals and Review ("OAR") in Brooklyn, New York on or about June 27, 2014.

234.   The DOE mandates that a complete set of the documents used to evaluate a teacher be sent to the teacher three (3) weeks prior to the DOE appeals hearing, which is a violation of a rule, policy, and custom.

235.   Lucio did not receive, as mandated by the DOE, a complete set of the documents used to evaluate him prior to the hearing in direct violation of the rights given to him by the State of New York Public Relations Board because the Defendants wanted to commit a crime by altering and withholding evidence on May 4, 2015—Lucio has to listen to Bernard say, "Oh, we can't speak about that now. (sigh)"

236.   On May 4, 2015, a hearing was conducted by the DOE Office of Appeals and Review in Brooklyn, New York, for Lucio's appeal

237.   The DOE evidence used against Lucio at the hearing was defective **(the rubric submitted was falsified, one whole observation report was concealed from the hearing, and another observation report was falsified and half of it was concealed from the hearing officer and Plaintiff.)**

238.   In violation of the DOE's own rules and procedures, the DOE evidence contained multiple unsigned observation reports. A third observation report was improperly withheld without providing any reason for this—Bernard said, "Oh, we can't speak about that. (sigh)"

239.   The unsigned observation reports should not have been considered by the hearing officer or admitted into evidence, which is another violation of a rule, custom, policy, and ordinance for the Defendants.

240.   On information and belief, the DOE evidence contained partial and false observation reports.

241.   The DOE's evidence also lacked the mandated formal evaluation by Bernard, as she had failed to conduct a formal evaluation of Lucio because he was endangered of receiving a U rating for the year.

242.   Further, at the hearing Lucio was informed that he was not allowed to cross-examine the Principal by Patricia Lavin.

243.   The hearing officer improperly considered Lucio's appeal based on defective procedures and false, missing, and incomplete evidence, without the benefit of testimony, which would have been obtained from Lucio's cross examination of the Principal.

244.   The hearing officer's decision, issued on or about June 8, 2015, improperly affirmed Lucio's U rating.

245.   Under DOE rules and procedures, a teacher is entitled to a tape recording of the appeal hearing.